**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTINA JOHNSON, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE VANGUARD GROUP, INC., | : | No. 13-4407 |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

TIMOTHY R. RICE                                                                                          January 13, 2015
U.S. MAGISTRATE JUDGE

This dispute concerns the termination of Plaintiff Christina Johnson's employment at the Defendant Vanguard Group, Inc. ("Vanguard"). Following a two-day, non-jury trial, I find that Johnson has failed to meet her burden to prove that Vanguard discriminated against her based on her religious beliefs when it progressively disciplined her and, ultimately, terminated her employment.

Both sides agree on Johnson's technical proficiency, but disagree on the quality of her interpersonal skills. When the witnesses' recollections diverge, I discredit Ms. Johnson's testimony and credit that of Vanguard's witnesses, Courtney Skillman, Rebecca Titanic, and Lester Hawthorne, because each of the Vanguard witnesses was consistent with one another and the contemporaneous documentation. Moreover, the witnesses' testimony and the documentation showed a pattern, on Johnson's part, of misconstruing events and comments.

I make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52 by a preponderance of the evidence.

**FINDINGS OF FACT**

1. Vanguard hired Johnson in August 2007 to work as a fund financial associate. N.T. 8/26/14 ("T1") at 16:25-17:7.

2. In her 2008 Appraisal, Johnson's supervisor, Valentina Ruggirello, rated Johnson's overall performance as "Further Development Needed," the second-lowest of four available ratings, and specifically criticized her "miscommunications with peers, internal management, and external clients." Ex. D-18, p. VCJ00052.

3. As part of the 2008 Appraisal, Johnson was directed to "focus on establishing effective relationships with her peers, internal clients, and external clients." Id.

4. In her 2009 Appraisal, Johnson's supervisor, Dana Male, rated Johnson's overall performance as "Further Development Needed," and specifically criticized her "managing relationships and effective communications." Ex. D-20, p. VCJ00072.

5. In her 2010 Appraisal, Male rated Johnson's overall performance as "Did Not Meet Expectations," the lowest available rating, and criticized her "resistan[ce] to accepting feedback," which "limited [Johnson's] ability to make improvements in the way [she] managed working relationships." Ex. D-27, p. VCJ00086. Male further criticized Johnson's "negative, defensive attitude," "control of [her] emotions," "courtesy," and "professionalism." Id.

6. In April 2011, Johnson was switched to a new position under a new manager, Titanic, in part because of the opinion of Skillman, a human relations specialist at Vanguard, that Titanic was a "stronger leader" who would be better suited to managing Johnson. N.T. 8/27/14 ("T2") at 126:13-17.

7. Johnson claims to have sincerely held religious beliefs regarding visiting establishments that serve alcohol. T1 at 26:11-24.

8. Hawthorne, who attends the same church as Johnson, disputed her contention that any religious doctrine would prohibit her from entering a bar that primarily serves alcoholic beverages and ordering a non-alcoholic drink.  T2 at 151:2-4, 177:1-21.

9. Titanic used various "team building" techniques to improve productivity and camaraderie, including lunches, baseball games, cake and ice cream, etc.  Ex. D-50 at VCJ01415-26.  Of the approximately 30 team events to which Johnson was invited by Titanic while being supervised by her, only three or four were events at which alcohol was served.  T2 28:11-24; Ex. D-50, at VCJ01415-68.

10. Although Johnson alleges that shortly after being moved to Titanic's department she was invited to a happy hour and complained to Titanic that she did not want to attend mandatory happy hours due to her religious convictions, T1 at 24:3-9, I credit Titanic's testimony that Johnson never complained about having to attend happy hour events due to her religious beliefs, T2 at 37:11-16.

11. In any event, Johnson concedes this was the only complaint she ever made regarding religious discrimination at Vanguard.  T1 at 48:13-16.

12. Shortly after joining Titanic's team in April 2011, Johnson met with Hawthorne, Titanic's supervisor.  T1 at 79:18-19.  She has never informed Hawthorne that she did not want to attend work-sponsored happy hour events due to her religious beliefs.  T2 at 174:15-18, 177:22-178:1.

13. In her 2011 Appraisal, Titanic rated Johnson's overall performance as "fully successful," the second highest of four possible ratings.  Ex. D-53, at VCJ00622.  With respect to "Managing Relationships," Titanic described Johnson as being receptive to feedback and making improvements regarding "perceptions/tone."  Id. at VCJ00621.

14.     Titanic also suggested that Johnson "continue looking for opportunities to further strengthen her bond with her teammates, as well as look for ways to interact with others in AS and VBS Operations to build a network."  Id.

15.     Finally, Titanic suggested Johnson work on "Managing Relationships" by "[p]articipat[ing] in departmental and/or team events (i.e. team builders)," "[a]ttend[ing] at least one brown bag session," "[a]ttend[ing] at least one department overview," and "[s]eek[ing] out Conflict Management related courses."  Ex. D-32, at VCJ00110.

16.     In early 2012, Johnson informed Titanic she would not be attending any more happy hour events and did not have time for "foolishness."  T1 at 46:18-21.  Religious beliefs were not cited.

17.     In February 2012, Titanic emailed Skillman to let her know of "tension" with Johnson stemming from Johnson's attempts to obtain another position within Vanguard for which Titanic did not believe she possessed the required qualifications.  Ex. D-33, at VCJ00208.

18.     In March 2012, Titanic waived the "time in job" requirement for Johnson, thereby permitting Johnson to apply for other positions within Vanguard despite having worked for Titanic for less than one year.  Ex. D-56, at VCJ00727.

19.     In her June 2012 Midyear Update, Titanic rated Johnson's "Build[ing] Strategic Working Relationships" and "Demonstrat[ing] Professionalism" as "development areas."  Ex. D-34.  Titanic noted Johnson had "an opportunity to improve her professional presence by being more engaged with those outside of the team, actively listening (making eye contact) and consistently having a more positive attitude."  Id.

20.     In mid-September 2012, Titanic told Johnson, in person and via email, that she needed to improve her management of relationships, and that teammates and Titanic found her demeanor, among other things, unapproachable and annoyed.  Ex. D-35, at VCJ00222-23.

21.     After their September 2012 meeting regarding Johnson's "managing relationship competency gaps," Titanic emailed three suggestions for how Johnson could improve: (1) seeking out a mentor; (2) joining a networking group; or (3) setting up an overview.  Ex. D-35, at VCJ00222.  Although none of these suggestions entailed entering a drinking establishment, Johnson rejected all of them.  Id. at VCJ00221.

22.     In conversations with Vanguard's human relations department before requesting that Johnson be given a Written Alert, Titanic expressed concern about Johnson's lack of eye contact, failure to smile, quietness, tone of voice, and eye-rolling.  Id. at VCJ00220.  She did not mention any failure to attend happy hours.

23.     On September 22, 2012, Titanic and Hawthorne met with Johnson and gave her a Written Alert regarding five performance deficiencies: (1) unapproachability; (2) disengagement; (3) nonreceptive[ness] and nonresponsive[ness] to feedback; (4) lack of resilience and composure; and (5) unprofessional[ism].  Ex. D-7, at VCJ00002.

24.     A Written Alert at Vanguard, the first step in the performance management process, is a statement that an employee has not addressed performance issues identified in oral warnings and includes a requirement that an employee put together a plan to improve his or her performance within a specific timeframe.  T2 at 61:22-62:3.

25.     Johnson, Titanic, and Hawthorne met approximately six times after this first Written Alert was issued in September 2012.  T2 at 65:3-6, 169:9-11.

26. During these meetings, Johnson claimed that Titanic's criticisms were based solely on Johnson's failure to continue attending happy hour events, but was repeatedly advised that her attendance at after-hour events was not required and did not impact her performance review. T1 at 6:12-16, T2 at 168:9-21.

27. Despite being informed that her negative treatment of co-workers, clients, and management was the behavior she needed to address, Johnson expressed confusion as to what she was supposed to improve, and claimed she did not have to make improvements if she did not agree with the assessed deficiency. T2 at 174:25-176:2.

28. In October 2012, Johnson drafted a "personal plan" that was edited by Titanic, Ex. D-37, at VCJ00233-37, which acknowledged Titanic's criticism that Johnson was failing to engage with her co-workers when she failed to participate in a community garden and United Way game. Johnson explained her lack of participation by pointing out others who also had failed to participate, and contending that she should not be required to engage with her co-workers. Ex. D-37, at VCJ00234.

29. Another exchange in the October 2012 personal plan concerns Johnson's charge that her activities outside of work had not been adequately encompassed in her "managing self" assessment; here, she complained that Titanic expected her to "spend time with her at a bar, charity events or doing other things while I am busy doing the things that are apart [sic] of my development." Id. Titanic responded that her suggestions "were designed to help [Johnson] change perceptions here at Vanguard," and she clarified that "none of these conversations of engagement have been about going to bars or anything outside of work hours." Id.

30. In another exchange in the October 2012 personal plan, Johnson complained about Titanic using her Vanguard email to "promote personal events," and Titanic agreed to

6

discontinue this practice, although she noted "this does not help address the disengagement issue." Id. at VCJ00235.

31.     In November 2012, Johnson complained to the human relations department about being "forced to do team activities," but specifically referenced the community garden, a United Way assembly, and social conversations with co-workers, without mentioning happy hours or any other event concerning alcohol. Ex. D-36, at VCJ00227. Religious discrimination was not mentioned.

32.     In the "Action Plan" Johnson drafted in response to her second Written Alert, she proposed "[e]ngag[ing] with peers and other members of [the] department through scheduled and unscheduled events" to remedy her "[d]isengagement." Ex. D-63, at VCJ01166. In her edits to Johnson's Action Plan, Titanic wrote that the disengagement criticism "is not about the social aspect," but rather "being 'present' and involved" like the way Johnson had behaved "during our team's mission statement meeting." Id. In hand-written comments that were also reviewed by Johnson, Titanic suggested Johnson make more eye contact. Id.; T2 at 72:24-25 (Johnson "saw your comments? Yes.").

33.     In her 2012 Appraisal, Titanic rated Johnson's overall performance as "Did Not Meet Expectations." Ex. D-41, at VCJ00129. She specifically criticized Johnson's failure to "build productive or positive relationships with her peers or management," and "demonstrate resilience or composure in several instances," including "on hotline calls," in "team settings," and during meetings with Titanic. Ex. D-41, at VCJ00128-29. According to Titanic, Johnson also failed to be "receptive or responsive to constructive feedback regarding negative attitudes and perception," "demonstrate professionalism" or "make a concerted effort to improve in response to the Written Alert." Id.

34. In response to her December 2012 Appraisal, Johnson complained in writing that she "interacted with [her co-workers] relating to the business as required," but Titanic "emphasizes . . . volunteer situations like (vbpn and happy hour) which I could not participate [in] due to commitments outside of work relating to professional development." Ex. D-41, at VCJ00130. In response to her comments, Titanic wrote "[i]t has been discussed with you multiple times that the engagement has nothing to do with volunteer things (and certainly not events outside of work). It has to do with the day-to-day interaction with peers and management, which can be addressed by changing behaviors, including non-verbal gestures. The perception is that you are disengaged and are not supportive of a positive environment, which is what we are looking to improve." Id.

35. On February 1, 2013, Titanic gave Johnson a second Written Alert, citing the same concerns as the first Written Alert as well as concerns about Johnson's "negative tone" with Titanic and failure to "respond[] professionally" in conversations regarding her professional deficiencies. Ex. D-8, at VCJ0004.

36. In response to the second Written Alert, Johnson prepared an action plan, with the assistance of Titanic. T2 at 77:15-16, Ex. D-63, at VCJ01166.

37. On February 5, 2013, Hawthorne met with Johnson and informed her that she was not complying with her action plan, and that the next disciplinary step against her would be a Formal Warning. Ex. D-70, at VCJ01254.

38. On February 21, 2013, Hawthorne and Titanic met with Johnson, and Hawthorne placed Johnson on Formal Warning. T1 at 101:10-24; T2 at 94:4-6, 180:18-20; Ex. D-9.

39. The Formal Warning criticized Johnson's continuing failures regarding "unapproachability," "disengagement," "lack of interaction," receptiveness and responsiveness to feedback, "resilience and composure," and "negative tone."  Ex. D-9, at VCJ00007.

40. The Vanguard witnesses consistently testified that "disengagement" did not refer to Johnson's failure to attend after-hours events.  T2 at 79:13-25, 128:7-15, 168:6-169:5.

41. After Titanic left the February 21, 2013 meeting, Johnson's criticism of Titanic convinced Hawthorne he should terminate Johnson's employment with Vanguard.  T2 at 181:19-182:16, 183:13-17.

42. Hawthorne based this decision on his repeated observations of Johnson's behavior and his belief that her behavior would not improve.  T2 at 182:6-16, 184:3-5.

43. Hawthorne communicated this decision to Skillman and his own supervisor.  T2 at 183:3-9; Ex. D-11, at VCJ00295.

44. Skillman agreed with Hawthorne's decision and wrote a second email, in conjunction with Hawthorne, to Skillman's supervisor to obtain clearance for Johnson's termination.  Ex. D-11, at VCJ00291-294.

45. Skillman was authorized to fire Johnson on March 7, 2013, and Hawthorne did so in a meeting that included Skillman.  Ex. D-11, at VCJ00290-91.

46. Skillman told Johnson at that meeting that she was fired for failing to effectively manage and maintain positive working relationships at work.  Id.

47. At her termination meeting, Johnson claimed only that she had been terminated "for not getting along with" Titanic.  Ex. D-11, at VCJ00291.  She did not mention religious discrimination.  Id.

9

**CONCLUSIONS OF LAW**

48.     There are numerous legal theories by which a plaintiff can pursue a religious discrimination claim.  The simplest requires a plaintiff to prove by a preponderance of the evidence that: (1) she held a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of this belief; and (3) she was disciplined for failing to conform to the conflicting job requirement.  Webb v. City of Philadelphia, 562 F.3d 256, 259 (3d Cir. 2009) (citing 42 U.S.C. § 2000e(j)).  The theory imposing the lowest burden of proof requires that a plaintiff prove only that the employer had a "mixed-motive," i.e. that the plaintiff's exercise of a sincere religious belief was one of the motivating factors in the plaintiff's discipline or termination.  Makky v. Chertoff, 541 F.3d 205, 213-14 (3d Cir. 2008) (citing 42 U.S.C. § 2000e-2(a)(1)).

49.     Johnson's choice of legal theory is unclear.  See Plaintiff's Proposed Findings of Fact and Conclusions of Law (doc. 39), Conclusions of Law, ¶¶ 1-12.

50.     Vanguard contends Johnson is pursuing a "disparate impact" theory of religious discrimination, which requires proof that she (1) is a member of a protected class; (2) was qualified for her position; (3) suffered an adverse employment action, and that (4) nonmembers of the class were treated more favorably.  Abramson v. William Paterson College of N.J., 260 F.3d 265, 281 (3d Cir. 2001).

51.     Johnson testified that Titanic's criticisms, which ultimately led to her termination, were made only after Johnson stopped attending after-hours happy hour team building events. T2 at 7:16-8:6.

52.     Even using the lowest burden of proof available to her, however, Johnson has failed to establish a prima face case of religious discrimination.

53.     I credit Johnson's sincerely held religious belief – even though Hawthorne is a member of the same church as Johnson and disputes that refusal to even enter an establishment that serves alcoholic beverages along with food and non-alcoholic beverages is not a tenet of Johnson's faith.  Frazee v. Dep't of Employment Security, 489 U.S. 829, 834 (1989) (sincerely held religious beliefs are protected, even if they are not direct "commands of a particular religious organization.").

54.     Regardless of the legal standard used, however, Johnson cannot prevail in a religious discrimination case without showing that Vanguard knew of her religious beliefs.  Geraci v. Moody-Tottrup, Intern., Inc., 82 F.3d 578, 581 (3d Cir. 1996) (plaintiff cannot make a prima facie case of religious discrimination without establishing employer was notified of religion) (citing  Protos v. Volkswagen, Inc., 797 F.2d 129, 133 (3d Cir. 1986), cert. denied, 479 U.S. 972 (1986) and Beasley v. Health Care Serv. Corp., 940 F.2d 1085, 1088 (7th Cir.1991)).

55.     Johnson admits she had only one conversation at Vanguard about her religious beliefs: her conversation, upon joining Titanic's group, about not being able to attend happy hours because of her religion.  T1 at 40:17-41:12l; see supra, at ¶ 9.  I discredit her claim, based on Titanic's denial of Johnson's alleged conversation.  Id.  Thus, no one at Vanguard had any knowledge of Johnson's religious beliefs.

56.     Johnson has provided no evidence to rebut Hawthorne's testimony that when he made the decision to terminate her he was unaware of her religion or that she claimed she had declined to attend happy hours on the basis of sincerely held religious beliefs.  T2 at 177:22-178:1, 186:10-16.

57.     Because Hawthorne decided to terminate Johnson without knowing of her religious beliefs, Johnson has failed to establish a prima facie case of religious discrimination.

Sarullo v. U.S. Post Serv., 352 F.3d 789, 799 (3d Cir. 2003) (finding plaintiff could not state a cause of action against former employer because decision-maker did not know he was a member of a protected class even though other employees, including his direct supervisors and co-workers, knew).

58.    Moreover, Vanguard offered uncontradicted evidence that Hawthorne independently decided to terminate Johnson for legitimate business reasons related to her work performance.  T2 at 183:13-17, 184:2-5.

59.    There is no credible evidence that Johnson's failure to continue attending happy hours in 2012 affected her performance evaluations.

60.    The closest Johnson can come to making any such offer of proof is by pointing to the criticisms of her "disengagement," which was cited as a performance issue on all three of her progressive disciplinary actions, the two Written Alerts and one Formal Warning.  Ex. D-7, at VCJ00002 ("Disengagement"), Ex. D-8, at VCJ00004 ("Disengagement"), and Ex. D-9, at VCJ00007 ("lack of interaction with some of your peers and management").

61.    The Vanguard witnesses consistently testified, however, that this did not refer to Johnson's failure to attend after-hours events, T2 at 79:13-25, 128:7-15, 168:6-169:5, and the contemporaneous documentation supports the Vanguard witnesses.  See, e.g., Ex. D-32, at VCJ00110 (Johnson's 2011 Appraisal, advising her to work on "managing relationships"); Ex. D-35, at VCJ00222 (September 2012 email from Titanic suggesting Johnson "manage relationship competency gaps" by seeking a mentor, joining a networking group, or setting up an overview); Id. at VCJ00220 (Titanic's critique concerned lack of eye contact, failure to smile, quietness, tone of voice, and eye-rolling); Ex. D-37, at VCJ00233-37 (October 2012 "personal plan" in which Johnson argues she should not be required to "engage" with her co-workers by

participating in a community garden or United Way event); Ex. D-63, at VCJ01166 (Titanic's notes on Johnson's February 2012 "Action Plan" explaining that the disengagement criticism "is not about the social aspect," but rather "being 'present' and involved" like the way Johnson had behaved "during our team's mission statement meeting" and doing things like making more eye contact);  Ex. D-41, at VCJ00130 (Titanic's explanation that "engagement has nothing to do with volunteer things . . . [i]t has to do with day-to-day interaction with peers and management, which can be addressed by changing behaviors, including non-verbal gestures.").

62. Finally, Vanguard produced evidence that, out of the approximately 30 team events to which Johnson was invited by Titanic while being supervised by her, only three or four were events at which alcohol was served.  T2 28:11-24; D-50, at VCJ01415-68.  Thus, even if Johnson thought Titanic was encouraging her to attend after-hours events – despite the overwhelming evidence that this was not required to overcome the "competency gap" of "disengagement" – Johnson has failed to prove that attending more events would have entailed happy hours or otherwise visiting establishments in violation of her religious beliefs.

63. Johnson has failed to prove by a preponderance of the evidence that Vanguard discriminated against her on the basis of her religion.

64. An appropriate Order follows.